Michael Dieni
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
550 West Seventh Avenue, Suite 1600
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JASMINE DANIELLE HOLLIMON,<br><br>    Defendant. | Case No. A05-0099 CR (JWS)<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

    Jasmine Danielle Hollimon, by and through counsel Michael Dieni, Assistant Federal Defender, submits her sentencing memorandum.  The court has wide discretion and may lawfully sentence Ms. Hollimon to either a largely probationary sentence or to a term of imprisonment, or something in between.  The question presented is whether a lengthy term of imprisonment is *necessary* for the offense committed, the theft of a large amount of money, when committed by a very young woman with no criminal history and very good immediate prospects for future success.

      *1.*     *The Law Provides for Alternatives to a Lengthy Term of Imprisonment*

The offenses of conviction, conspiracy and transportation of stolen goods, are violations of 18 U.S.C. §§ 371 and 2314. Neither carries a mandatory minimum sentence. The greater of the two offenses, Count 2, under 18 U.S.C. § 2314, has a maximum term of ten years, which makes it a Class C felony. 18 U.S.C. § 3559. The charging statute for the greater offense specifically allows for a fine to be imposed as an alternative to imprisonment. 18 U.S.C. § 2314.

For Class C and D felonies, the court is specifically authorized to impose probation as an alternative to imprisonment. 18 U.S.C. § 3561(a). If so, Ms. Hollimon could be placed on probation supervision for up to five years. 18 U.S.C. § 3561(c)(1). If the court imposes imprisonment, the court is authorized to impose supervised release for a period up three years. 18 U.S.C. § 3583(b)(2). A probationary sentence, therefore, allows for an additional two years of supervision. Probation as a sentence may include conditions involving *de facto* incarceration. For example, home detention, or residency in a center of community corrections, is an option. 18 U.S.C. §§ 3563(b)(11), (13).

The basis for any sentence begins with 18 U.S.C. § 3553(a), which raises the fundamental question: What sentence is "sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)?" This so-called "parsimony provision" is not simply a factor to be considered in determining the sentence – it is the primary guiding principle behind all non-mandatory sentences and represents the hard and fast cap above which the court is statutorily prohibited from sentencing, even if a greater sentence might be recommended by the sentencing guidelines.

Therefore, while the court may logically begin with a discussion of the guidelines, the sentencing guidelines are only one of five factors to be considered in determining the sentence. *Booker*, 125 S. Ct. at 764-65. The other four factors are (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the need to avoid unwarranted sentencing disparity; and (d) the need to provide restitution. *Id.*; 18 U.S.C. §§ 3553(a)(1), (a)(6)-(7).

The Ninth Circuit has established that this court has exceptionally broad authority to be lenient in the context of a first-time offender convicted of a property offense. *United States v. Menyweather*, 431 F.3d 692, 696-97 (9th Cir. 2005). In *United States v. Menyweather*, the trial court imposed a sentence of 40 days, to be served on weekends, as a condition of probation for an employee of the United States Attorney's Office who embezzled approximately $436,000 over the course of nearly three years. The defendant had used the money frivolously to travel around the world and buy expensive items for herself. The Ninth Circuit Court of Appeals affirmed the sentence.

2. The Nature of the Offense and History and Characteristics of the Offender

In 2002, at the inception of the offense conduct, Ms. Hollimon was 21 years old. She had no criminal record of any kind, adult or juvenile, and no significant police contacts. There was nothing obvious that could have predicted the present offense conduct.

At the time, at age 21, she was an ordinary young working woman, just getting by. Living on a small income was nothing new; she had been working at low paying

jobs since she was 15 years of age, when she left home. PSR ¶¶ 136, 150. She obtained her G.E.D. at age 18. PSR ¶ 145. Her parents had been divorced when Ms. Hollimon was approximately 7 years old. Although she experienced unstable residency as she grew up, with violence between her parents, she does not report any history of extreme abuse. To speak with Ms. Hollimon at age 21, she might have seemed to be an ordinary young person, experiencing the ordinary ups and downs of life in the city. There were problems, however, that lay just beneath the surface.

The first significant hallmark of the offense now before the court is a reported history of clinically defined depression. PSR ¶¶ 140, 141. Like many people in low paying jobs, she lacked insurance to pay for proper medical treatment, and received none. PSR ¶ 141. Her history of depression was exacerbated by the sudden deaths of two of her closest friends. PSR ¶ 163.

These circumstances, relative poverty, depression, and harsh personal circumstances, all contributed to Ms. Hollimon chief downfall, the abuse of OxyContin. PSR ¶¶ 140 through 143.

OxyContin is a prescription drug, a controlled substance, based upon oxycodone, and produces opiate-like effects. For an authoritative description of the drug, its abuse nationwide, and criminal activity, *see* www.whitehousedrugpolicy.gov/drugfact/oxycontin/index.html. Most individuals who abuse this drug do so to gain euphoric effects, relieve pain, and to avoid withdrawal symptoms. *Id*. Most individuals who use the drug do not become addicted, per se, but they do become dependent. The drugs effects are insidious, and over time a user's body becomes physically resistant to the effects of the drug and the user needs more to get the euphoric effects. *Id*.

Unfortunately, Ms. Hollimon fell into the OxyContin trap. Ms. Hollimon is not suggesting to this court that she did not know what she was doing when she took coins from Oxford. Nor does she claim that drugs somehow *made* her do it. What she does claim is that the drug abuse, as described above, explains the extent and duration of the offense, and how a person like herself fell so far along the slippery slope.

The offense is repeatedly described in the PSR and in the plea agreement and will not be thoroughly repeated here. Ms. Hollimon took gold coins from Oxford Assaying and traded them for drugs or sold them to shops that would pay the going rate. To do this, Ms. Hollimon enlisted the help of friends, such as Sarah Noble, Hilary Pattison, Ben Oglesby, and Mike Tucker.

Any suggestion that these people were somehow fooled or coerced or tricked into getting involved is false. Mike Tucker did it in trade for drugs he sold to Ms. Hollimon. Pattison also fell into the drug trap. Noble and Oglesby did it out of greed. The court should reject out of hand the self-serving comments by co-defendants sometimes found in other proceedings or in the PSR, somehow claiming that Ms. Hollimon manipulated these people into doing something they were not ready, willing, and able to do. Ms. Hollimon exercised no *control* over any of these people. They did what they did, voluntarily and for their own benefit.

Andrew Steinborn's situation is somewhat different from others identified above. He became a co-worker at Oxford. Though there is evidence he learned of Ms. Hollimon's theft activity, and she explained to him how she did it, he did what he did mostly on his own, for himself. Ms. Hollimon did not control him. It appears that he may have involved other people totally unknown to Ms. Hollimon. *See* PSR objection to ¶ 23.

The offense itself ended in December 2004, when Ms. Hollimon was 23 years of age. With no money and no job, Ms. Hollimon managed to get off the OxyContin. She moved to Texas in March 2005, and stayed near other family for about six months, until October 2005. PSR ¶ 136.

Any claim that Ms. Hollimon has not admitted her guilt and fully accepted responsibility for her conduct is unsupported by the record. While she was in Texas, FBI agents contacted her for the first time in May 2005 about the current offense. She voluntarily consented to be interviewed and confessed to her involvement, specifically advising them, accurately, that she had stolen coins over the course of approximately two years. PSR ¶ 48.

She was not arrested at the time, but she certainly knew and understood that she had admitted to committing a serious offense in Alaska. She did not hide or run. In fact, she moved back to Alaska in about October 2005. The FBI arrested her then, and she again consented to be interviewed and made a second confession to the FBI, providing more details. PSR ¶¶ 58 through 62.

After getting counsel, she offered to cooperate with the government in its case against potential co-defendants. There is a plea agreement in the court file. The deal gets her virtually nothing but the opportunity to cooperate.[1] She since testified in Michael

---

[1] In fact, it is unclear that Ms. Hollimon gets anything at all by continuing to cooperate. She is clearly eligible for R-DAP, the 500 hour program and she could do that program and earn up to 12 to 18 months off her sentence. With a guideline recommendation at 30 to 37 months, any reduction by this court from a guideline sentence probably simply eats against the time she could earn on her own by completing DAP.

Tucker's trial. She is now told that her testimony was unpersuasive, due to her failure to remember details consistently.

No one is saying, however, that she lied to get Mr. Tucker in trouble. In fact, she has since testified before the state court grand jury that indicted Mr. Tucker, Mr. Oglesby, and Mr. Steinborn. Since then, Mr. Steinborn and Mr. Tucker have made deals with the state and they have been found guilty of related theft offenses. Mr. Oglesby awaits his trial. Ms. Hollimon awaits her opportunity to testify against him.

The simple truth that cynical onlookers can never know, for sure, is that Ms. Hollimon is genuinely sorry for what she has done here, and she sees her testimony as a means to try to make amends. Sure, she would be thrilled if she could avoid jail. Equally important, and key to such a result, is for people to know that in the past two years, on her own, she has truly turned her life around.

For example, in early November 2005, as a condition of her release, the bail conditions required UA testing. Her tests, after the beginning, have been clean.

Some of the letters that are attached provide the court with history both old and new. Her mother, Cheryl Creighton, provides the overall background. Most important, Ms. Creighton has explained how Ms. Hollimon has helped her deal with a worsening Multiple Sclerosis condition. Exhibit A.

Other friends and co-workers describe how Ms. Hollimon has faced up to the gravity of her situation and prepared to make the best of it. Exhibit B. They describe her conduct at work, which she has held for the past year, and her volunteer work at the Society for Prevention of Cruelty to Animals.

One unusual friend, Khaleb P. Arellano, knew Ms. Hollimon both before, during, and after she was involved with OxyContin. His comments are illuminating as to the changes that occurred during this process. Exhibit D.

The remainder of the letters sent to this court, enclosed as exhibits, generally describe the strength and willpower Ms. Hollimon has demonstrated in an attempt to prepare for any sentencing outcome. Exhibit E and F.

Finally, Ms. Hollimon has submitted her own letter. Exhibit G. It is consistent with her words to the FBI before she had the guidance of counsel. PSR ¶ 63.

As the court well knows, Ms. Hollimon's attempt to cooperate with the government has produced mixed results. She realizes that the formal request for a Rule 35(b) motion to reduce her sentence will come after Mr. Oglesby's case is over and the cooperation agreement is complete, and the time to determine what weight to give her cooperation must await that day.

Nevertheless, the court can independently take into account the fact of Ms. Hollimon's cooperation when making the necessary 18 U.S.C. § 3553 analysis of the history and characteristics of the defendant. In the context of sentencing, with regard to cooperation with law enforcement, the United States Supreme Court has stated the following:

> Few facts available to a sentencing judge are more relevant to "the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he does or does not deem himself at war with his society.

*Roberts v. United States*, 445 U.S. 552, 558, 100 S. Ct. 1358 (1980) (internal citations omitted).

Perhaps the Supreme Court understood the social significance of proving a willingness to stand against confederates. Ms. Hollimon certainly understands what it means. This past summer she discovered, during a Google search based upon her own name, that she has been publicized as a "snitch" in a website designed to expose people who have cooperated with the government. A copy of a printout of a few relevant pages from that website, "Who's a Rat," is easily located by imputting Ms. Hollimon's name, and is attached as Exhibit H. (Exhibit H does not include Ms. Hollimon's entire cooperation plea agreement, which is available on the website.)

3. *Other 3553 Factors*

A. *Seriousness of the offense*.

Ms. Hollimon acknowledges that this offense is legitimately considered more serious than most, due to the extent of the loss and the number of individuals involved. The four level enhancement for leadership is probably overstated in weight. Ms. Hollimon did not exercise "control," *per se* over confederates. Nor can her involvement be described as the production of an "organization." She initiated the criminal conduct, for sure, in different ways with different individuals. It was not, however, some form of mafiosa, top down, leadership of a crime organization.

B. *Deterrence of criminal conduct*

For a first offender such as Ms. Hollimon, a lengthy jail sentence in prison is unnecessary to deter criminal conduct. A combination of alternatives, such as home confinement, community corrections, and community work service would accomplish the same end.

  C. *Protection of the public from Ms. Hollimon*

There is no basis in this record to conclude that Ms. Hollimon poses a continuing threat to the community. Putting her in prison for any amount of time as contemplated by the guidelines would not reduce any perceived threat.

  D. *To provide Ms. Hollimon educational opportunities, etc.*

Ms. Hollimon can benefit from drug counseling and mental health counseling, though a year of clean UA tests would seem to indicate that she is not in dire need of residential counseling. All other aspect of jailhouse educational offerings, e.g., college courses, culinary training, etc, can be better accomplished outside of jail.

  E. *The kinds of sentences available*

As discussed above, alternatives to incarceration are numerous.

  4. *PSR Objections*

  A. *Restitution as a function of loss*

The addendum to the PSR provides notice that Ms. Hollimon has concerns about the total loss value of $288,621.88 set forth at ¶¶ 23. For now, Ms. Hollimon objects to the amount asserted. An effort to meet with opposing counsel to reach a stipulation before sentencing will be attempted.

  B. *Self-serving Hilary Pattison statements*

Unfortunately, the PSR includes numerous statements made by indicted and unreliable co-defendant Hillary Pattison, who had an interest in trying to shift blame from herself onto Ms. Hollimon. Ms. Hollimon's objections have been incorporated into the

report in the form of footnotes. Each of those footnotes, as they appear at ¶¶ 26, 72, 75, 76, 77, 81, 83, 87, 94, and 95, are hereby reiterated as formal objections to the PSR.

*Conclusion*

Putting Ms. Hollimon in jail for the kind of lengthy period of incarceration recommended by the Sentencing Guidelines would be a waste. It would fail to recognize her youthfulness and her post-offense accomplishments. It would fail to recognize and capitalize on her value as a volunteer to SPCA, or a helpmate to her M.S. afflicted mother. Most important, it would fail to recognize the wide array of alternative options available to the court to accomplish the same end. For these reasons, and those set forth above, Ms. Hollimon requests that the court strongly consider these options.

DATED this 9th day of November, 2006.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Michael D. Dieni
Assistant Federal Defender
Alaska Bar No. 8606034
550 West 7th Avenue, Suite 1600
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mike_dieni@fd.org

Certification:

I certify that on November 9, 2006, a copy of the foregoing, with attachments, was served electronically on

Retta-Rae Randall, Esq.

/s/ Michael D. Dieni

11